**CROWN OPERATIONS INTERNA-TIONAL, LTD. and Marshall H. Krone, Plaintiffs–Appellants,**

v.

**SOLUTIA INC., Defendant–Appellee.**

No. 01–1144.

United States Court of Appeals, Federal Circuit.

DECIDED: May 13, 2002.

Rehearing Denied: June 10, 2002.

---

Joseph T. Leone, DeWitt Ross and Stevens, S.C., of Madison, WI, argued for plaintiffs-appellants. With him on the brief was Joseph A. Ranney.

Gregory E. Upchurch, Thompson Coburn LLP, of St. Louis, MO, argued for defendant-appellee. With him on the brief were Kenneth R. Heineman, and Dudley W. Von Holt.

Before LOURIE, CLEVENGER, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

Crown Operations International, Ltd., and Mr. Marshall H. Krone (collectively "Crown"), appeal the decision of the United States District Court for the Western District of Wisconsin denying Crown declaratory relief that Solutia's U.S. Patent No. 4,973,511 ("the '511 patent") is invalid for lack of novelty and non-obviousness, and that Solutia's U.S. Patent No. 5,091,-258 ("the '258 patent") is invalid for lack of enablement and written description. *Crown Operations Int'l, Ltd. v. Solutia, Inc.*, No. 99–C–802–S, slip op. at 8 (W.D.Wis. Aug. 30, 2000) (memorandum decision and order granting summary judgment) (*"August 30 Order"*); *Crown Operations Int'l, Ltd. v. Solutia, Inc.*, No. 99–C–802–S, slip op. at 24, 27 (W.D.Wis. Aug. 22, 2000) (same) (*"August 22 Order"*). Because we find no error in the district court's opinion with respect to the '511 patent, we affirm that portion of the district court's decision. However, because the district court erred in its analysis of enablement for the '258 patent, and did not address the written description issue for the '258 patent, we vacate the district court's grant of summary judgment on that issue and remand for additional proceedings consistent with this opinion.

## I. BACKGROUND

The patents at issue in this appeal relate to layered films used to create safety and solar control glass. An example is an automobile windshield. Most windshields have two layers of glass with a multi-layer film between the glass layers. The multi-layer film adds properties to the glass assembly, such as impact resistance or providing a conductive layer that facilitates defrosting the windshield. An inner layer of the film has solar control properties to selectively reflect, absorb (and thus convert to heat) or transmit defined percentages of certain wavelengths of light. This inner layer is called the solar control film. It is made of a substrate coated by one or more layers of metal or metallic substances. '511 patent, col. 3, l. 64 to col. 4, l. 2. Typically, manufacturers laminate the solar control film between layers of plasticized polyvinyl butyral ("PVB") (sometimes called the "safety film") in a process known as encapsulation. Then, the encapsulated solar control film is sandwiched between two pieces of glass for a final assembly of multi-layer glass with safety and solar control properties.

### A. The '511 Patent

The '511 patent is directed to the problem that the metal-coated substrate, *i.e.*, solar control film, tends to wrinkle during encapsulation causing visual distortions. The '511 patent claims to mask the wrinkles from detection by the human eye by

limiting to two percent or less the visible light reflection contribution of the solar control film compared to reflection from a complete assembly of glass, PVB and solar control film. '511 patent, col. 4, ll. 46–49, col. 8, l. 66 to col. 9, l. 6, col. 14, l. 67 to col. 15, l. 2. Figure 1 from the '511 patent, set forth below, shows the layers in a complete assembly.

**FIG. 1**

The complete safety and solar control glass assembly 10 includes two outer glass layers 28 & 30, PVB layers 22 & 23, and the solar control film 20. The solar control film is comprised of a substrate layer 16 and solar control coating 18. '511 patent, col. 3, ll. 41–53, col. 7, ll. 2–4, col. 10, l. 15. Figure 3 from the '511 patent, set forth below, shows the sub-layers of the solar control coating 18.

**FIG. 3**

Layer 18 is made of multiple sub-layers. Layers 34 and 36 are metal oxide, and layer 38 is metal. '511 patent, col. 5, ll. 12–14. In addition, the '511 patent notes that "[p]rior automotive windshields have visible light reflection contributions for their solar films of three percent or greater." Further, it relates that the primary method of achieving a low solar control film reflectance contribution is by providing a specially-designed solar coating. '511 patent, col. 4, ll. 56–65.

On December 16, 1999, Crown sued Solutia (the "Initial Complaint"), seeking, among various other relief, a declaration that the '511 patent was invalid for anticipation and obviousness. Upon the parties' cross-motions for summary judgment, the district court found the '511 patent not anticipated and not invalid for obviousness. *August 22 Order* at 24, 27. We discuss herein only those portions of the *August 22 Order* relevant to the issues on appeal, which relate solely to the summary judgment finding that the '511 patent was not

invalid on the grounds of anticipation and obviousness.

Claim 1, the only independent claim of the '511 patent, is set forth below, with the element numbers from Figure 1 inserted into the claim.

> 1. A composite solar/safety film [24] for use in a laminated window assembly [10] comprising:
>
> a flexible, transparent plastic substrate layer [16] having a carrier surface and an opposing back surface;
>
> a multilayer solar control coating [18] on said carrier surface, said coated substrate defining a solar control film [20]; and
>
> at least one flexible, transparent, energy absorbing plastic safety layer [23 and/or 22] bonded to a surface of said solar control film;
>
> wherein said *solar control film contributes no more than about 2% visible reflectance,* based on total visible incident radiation, in a laminated window assembly containing said composite solar/safety film laminated to at least one rigid transparent member [30 and/or 28].

'511 patent, col. 14, l. 57 to col. 15, l. 4 (emphasis added and emphasized numbers added to identify elements shown in Figure 1 above).

Crown argued that U.S. Patent No. 4,017,661 to Gillery (the "Gillery patent") anticipates the '511 patent. The district court held otherwise, because, while the Gillery patent discloses the first three limitations of claim 1 of the '511 patent, it does not disclose the two percent visible reflectance limitation. The court found that neither the Gillery patent claims nor its description expressly disclose a two percent limit on reflectance contribution from the solar control film layer. Crown argued that the two percent limitation was inherently present in the Gillery patent's teachings because the Gillery patent disclosed an assembly with PVB layers, substrate layer, and substrate metal-coating—arguably of the same composition and thickness of the films disclosed by the '511 patent. Thus, Crown argued, because the structure, thickness and materials of the assembly were the same or within the same range(s), the Gillery patent must inherently disclose a two percent limitation. The district court rejected this argument because it found that none of the embodiments disclosed by the Gillery patent meet the two percent visible light reflectance limit.[1]

In its *August 22 Order,* the district court also held that the '511 patent was not rendered invalid for obviousness by Gillery or the other prior art cited by Crown because no prior art discloses: (i) that reflectance below two percent will mask wrinkles; (ii) a solar control film layer with reflectance below two percent; or (iii) any suggestion, motivation or teaching to reduce solar control film visible light reflectivity below two percent. Although the prior art generally sought to reduce visible light reflectivity, it also taught disadvantages of a very thin metal-coating on the substrate, including sacrificing infrared reflectivity. Thus, it taught that the proper compromise to achieve the conflicting goals of infrared (non-visible light) reflectance, visible light transmission and conductivity

---

1. The district court, applying a similar analysis, also found that UK Patent Application GB 2 057 355 (the "UK patent") did not antici- pate the '511 patent because it did not have the two percent limitation.

was a solar control film with a visible light reflectivity greater than two percent.

### B. The '258 Patent

The '258 patent is directed at eliminating optical distortion, called "applesauce," in safety and solar control glass assemblies of the type discussed above for the '511 patent. The '258 patent discloses a method to control distortion otherwise caused by the safety and solar film layer by measuring and controlling the texture of the surface of the PVB layers. The method expresses texture using a "wave index" and a "roughness value." The wave index calculation is at issue in this appeal. Wave index indicates the relative waviness of the surface of the PVB. Determining wave index involves measuring the surface of the PVB and then aggregating the measurements into a single number, the wave index, through a calculation purportedly described in the '258 patent.

The '258 patent directs one to use an instrument to physically measure the waviness of the surface of the PVB and capture the measurement into an electronic "trace line" representing the contours of the PVB surface. '258 patent, col. 7, II. 54–65. Since the "trace line" is stored electronically, a computer program is used to calculate wave index from the trace. Three figures from the '258 patent, given below, provide examples of PVB surface trace lines.

FIG. 7

FIG. 8

FIG. 9

The rules for calculating the wave index implement a "smoothing" function. The smoothing process seeks to eliminate minor inflection points (peaks or valleys) to simplify the calculation of wave index. '258 patent, col. 7, I. 66 to col. 8, I. 2.

In the Initial Complaint, Crown sought a declaration that the '258 patent was invalid for anticipation and obviousness. Then, on May 26, 2000, Crown amended the complaint (the "Amended Complaint") to additionally claim in Count VI that the '258 patent is invalid under 35 U.S.C. § 112, first paragraph, because it lacked enablement and written description due to ambiguities in the disclosed wave index calculation. In its *August 22 Order*, the district court found the '258 patent not anticipated and not invalid for obviousness. *August 22 Order* at 28–29.

With respect to Count VI of Crown's amended complaint, Solutia moved for

summary judgment on Crown's enablement and written description claim. Crown opposed Solutia's summary judgment motion, arguing that the '258 patent did not meet the enablement and written description requirements. The district court found the '258 patent not invalid for lack of enablement, but did not discuss in its opinion the written description requirement. *August 30 Order* at 8–13. We discuss herein only those portions of the *August 30 Order* relevant to the issues on appeal, which relate to summary judgment finding the '258 patent not invalid on the grounds of enablement and the procedural disposition of the written description issue.

Claim 1 of the '258 patent is set forth below. In the language of this claim, "laminate" refers to the complete glass, PVB and solar control film assembly, and "functional performance layer" refers to the solar control coating. '258 patent, col. 3, II. 45–65.

> 1. A laminate which is substantially free of reflected distortion when used in a safety glazing comprising:
>
> a transparent, thermoplastic substrate layer, optionally surface treated or coated, bearing one or more functional performance layers; and
>
> at least one layer of plasticized polyvinyl butyral bonded on one side to a functional performance layer or the substrate layer and having a roughened deairing surface on its other side characterized by a roughness value, Rz, of at least 10 micrometers;
>
> said at least one plasticized polyvinyl butyral [PVB] layer, before bonding to the substrate layer or functional performance layer, ***possessing low surface waviness on each side characterized by a wave index value, WI, of less than 15,000 square micrometers.***

'258 patent, col. 12, II. 2–16 (emphasis added).

Crown argued that the rules disclosed by the '258 patent for calculating wave index are not sufficiently precise to enable a person of ordinary skill in the art to practice the '258 patent without undue experimentation. The wave index calculation as described by the '258 patent is set forth below.

> In this regard, considering the waviness profile as a series of peaks and valleys, the smoothing rules of the program consider an inflection point to be a true peak or valley if it is: i) at least 100 micrometers away from the immediately preceding prior peak or valley and ii) at least 0.5 micrometer above or below the immediately preceding prior peak or valley, a valley being at least 0.5 micrometer below the immediately preceding prior peak. Pitch (P) is the distance between one valley and the next valley or in other words across the base of a peak. Average amplitude (H avg) and average pitch (P avg) are determined by the program for the smoothed trace of ten 12.5 mm tracing lengths (the second five lengths being 90° to the first five lengths). From the average of the averaged H's and P's, a WI value is computed from the equation: Wave Index (WI) = (H avg) × (P avg) where H avg and P avg are in microns.

'258 patent, col. 8, II. 3–19.

Crown asserted that according to the disclosed wave index "calculation," one of ordinary skill in the pertinent art would not know whether to instruct the smoothing program to disregard a peak by comparing it to an immediately preceding peak, or to a valley. The district court held that common sense and the clarifying clause "a valley being at least 0.5 microme-

ter below the immediately preceding prior peak" defeated Crown's argument. Thus, the district court held that the alleged grammatical ambiguities in the rules disclosed for calculating wave index did not invalidate the patent for lack of enablement.

Crown timely appealed the district court's two orders, raising the issues of anticipation and obviousness of the '511 patent, and lack of enablement and written description of the '258 patent. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. STANDARD OF REVIEW

■■ We review a district court's grant of summary judgment without deference. *Atmel Corp. v. Info. Storage Devices, Inc.,* 198 F.3d 1374, 1378, 53 USPQ2d 1225, 1227 (Fed.Cir.1999). Summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion, *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), with doubts resolved in favor of the nonmovant, *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 582, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d 1270, 1274, 35 USPQ2d 1035, 1038 (Fed. Cir.1995). Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Issues of fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A disputed fact is material if it might affect the outcome of the suit such that a finding of that fact is necessary and relevant to the proceeding. *Id.; General Mills, Inc. v. Hunt–Wesson, Inc.,* 103 F.3d 978, 980, 41 USPQ2d 1440, 1442 (Fed.Cir. 1997).

■■ A patent is invalid for anticipation when the same device or method, having all of the elements contained in the claim limitations, is described in a single prior art reference. *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1236, 9 USPQ2d 1913, 1920 (Fed.Cir.1989); *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 894, 221 USPQ 669, 673 (Fed.Cir. 1984). An anticipating reference must describe the patented subject matter with sufficient clarity and detail to establish that the subject matter existed in the prior art and that such existence would be recognized by persons of ordinary skill in the field of the invention. *See In re Spada,* 911 F.2d 705, 708, 15 USPQ2d 1655, 1657 (Fed.Cir.1990); *Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 678, 7 USPQ2d 1315, 1317 (Fed.Cir.1988).

■ Obviousness is a legal conclusion based on underlying facts of four general types, all of which must be considered by the trier of fact: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness. *See Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Continental Can Co. USA, Inc. v.*

*Monsanto Co.,* 948 F.2d 1264, 1270, 20 USPQ2d 1746, 1750–51 (Fed.Cir.1991); *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1566–68, 1 USPQ2d 1593, 1594 (Fed.Cir.1987).

◼ "Determination of obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention." *ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 546, 48 USPQ2d 1321, 1329 (Fed.Cir.1998). There must be a teaching or suggestion within the prior art, within the nature of the problem to be solved, or within the general knowledge of a person of ordinary skill in the field of the invention, to look to particular sources, to select particular elements, and to combine them as combined by the inventor. *See Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 665, 57 USPQ2d 1161, 1167 (Fed.Cir.2000); *ATD Corp.,* 159 F.3d at 546, 48 USPQ2d at 1329; *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.,* 21 F.3d 1068, 1072, 30 USPQ2d 1377, 1379 (Fed.Cir.1994) ("When the patented invention is made by combining known components to achieve a new system, the prior art must provide a suggestion or motivation to make such a combination.").

◼ The written description inquiry is a factual one and must be assessed on a case-by-case basis. *See Vas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1561, 19 USPQ2d 1111, 1116 (Fed.Cir.1991) (quoting *In re Smith,* 59 C.C.P.A. 1025, 458 F.2d 1389, 1395, 173 USPQ 679, 683 (CCPA 1972) ("Precisely how close the original description must come to comply with the description requirement of § 112 must be determined on a case-by-case basis.")). In order to satisfy the written description requirement, the disclosure as originally filed does not have to provide in haec verba support for the claimed subject matter at issue. *See Fujikawa v. Wattanasin,* 93 F.3d 1559, 1570, 39 USPQ2d 1895, 1904 (Fed.Cir.1996). Nonetheless, the disclosure must convey with reasonable clarity to those skilled in the art that the inventor was in possession of the invention, *Vas–Cath Inc.,* 935 F.2d at 1563–64, 19 USPQ2d at 1116–17, although we have also clarified that the possession test alone is not always sufficient to meet the written description requirement, *Enzo Biochem, Inc. v. Gen–Probe Inc.,* 285 F.3d 1013, 1020–21 (Fed.Cir.2002). As such, "the written description requirement is satisfied by the patentee's disclosure of 'such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention.'" *Enzo Biochem,* 285 F.3d at 1021 (quoting *Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 1572, 41 USPQ2d 1961, 1966 (Fed.Cir.1997)). Put another way, one skilled in the art, reading the original disclosure, must reasonably discern the limitation at issue in the claims. *Waldemar Link, GmbH & Co. v. Osteonics Corp.,* 32 F.3d 556, 558, 31 USPQ2d 1855, 1857 (Fed. Cir.1994).

◼ Whether a claim is enabled under 35 U.S.C. § 112, first paragraph is a question of law, although based upon underlying factual findings. See *PPG Indus., Inc. v. Guardian Indus. Corp.,* 75 F.3d 1558, 1564, 37 USPQ2d 1618, 1623 (Fed.Cir. 1996); *In re Goodman,* 11 F.3d 1046, 1049–50, 29 USPQ2d 2010, 2013 (Fed.Cir. 1993).

### III.  DISCUSSION

#### A.  The '511 Patent

On appeal, Crown describes various purported errors in the district court's analy-

sis of the validity of the '511 patent. Despite Crown's contentions, we ascertain no error requiring reversal of the district court's determination of validity over Crown's claims of anticipation and obviousness.

◼ Regarding alleged anticipation by the Gillery patent, on its face the Gillery patent does not disclose or discuss a two percent limitation for the reflectance contribution of the solar control film. Crown maintains that the '511 patent merely claims a preexisting property inherent in the structure disclosed in the prior art. Crown urges us to accept the proposition that if a prior art reference discloses the same structure as claimed by a patent, the resulting property, in this case, two percent solar control film reflectance, should be assumed. We decline to adopt this approach because this proposition is not in accordance with our cases on inherency. If the two percent reflectance limitation is inherently disclosed by the Gillery patent,[2] it must be necessarily present and a person of ordinary skill in the art would recognize its presence. *In re Robertson*, 169 F.3d 743, 745, 49 USPQ2d 1949, 1950–51 (Fed.Cir.1999); *Continental Can*, 948 F.2d at 1268, 20 USPQ2d at 1749. Inherency "may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.* at 1269, 20 USPQ2d at 1749 (quoting *In re Oelrich*, 666 F.2d 578, 581, 212 USPQ 323, 326 (CCPA 1981)).

◼ In arguing inherent disclosure of the two percent limitation in the Gillery patent, Crown bears an evidentiary burden to establish that the limitation was necessarily present.[3] The moving party in a summary judgment motion has the burden to show "that there is an absence of evidence to support the non-moving party's case;" the non-moving party must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A patent enjoys a presumption of validity, *see* 35 U.S.C. § 282, which can be overcome only through clear and convincing evidence, *see United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563, 41 USPQ2d 1225, 1232 (Fed.Cir.1997). Given the presumption of validity afforded the '511 patent, Crown has failed to meet its burden because it has not presented sufficient evidence to rebut the facial evidence offered by Solutia that the Gillery patent does not

**2.** In order to claim "equivalent structure" between the Gillery patent and the '511 patent, Crown's inherency argument rests on a precondition of its own making—that the Gillery patent discloses use of $TiO_2$, even though it specifies $TiO_x$, where $\times$ is greater than 1.0 but less than 2.0. Although Crown vigorously argues this point, we do not reach this issue because even if Crown is correct that the structures are equivalent, Crown's inherency argument fails for the reasons set forth herein.

**3.** Crown's reliance on *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 36 USPQ2d 1225 (Fed.Cir.1995), and *O.I. Corp. v. Tekmar*

*Co.*, 115 F.3d 1576, 42 USPQ2d 1777 (Fed. Cir.1997), to characterize the two percent limitation as a "performance limitation" similar to the claim terms at issue in those cases is unpersuasive and overbroad. Respectively, *Pall* and *Tekmar* dealt with the claim terms "skinless" and "passage." Beyond the readily apparent difference between these potentially broad terms and the precise specification of a two percent limit in the '511 patent, characterizing a claim limitation as a "performance characteristic" is not helpful as to whether the "necessarily present" requirement of inherency is met.

disclose the two percent limitation. *See Eli Lilly & Co. v. Barr Lab. Inc.*, 251 F.3d 955, 962, 58 USPQ2d 1869, 1874 (Fed.Cir. 2001) ("[A] moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent."); *In re Robertson*, 169 F.3d at 745 (recognizing that extrinsic evidence may be required to establish inherency). Instead, Crown offers only an assumption and its own contentions.[4]

Crown also argues that the district court erred by comparing reflectance values in the Gillery patent to non-corresponding values in the '511 patent. *August 22 Order* at 23–24. While perhaps the district court could have been more careful to explain the basis of its comparison, on a close reading of the district court's analysis we find that the alleged improper comparison only supported the district court's primary point that no embodiment of the Gillery patent disclosed the two percent limitation, a conclusion that Crown has not shown to be in error.

▄▄ Finally, Crown argues that various prior art references invalidate the '511 patent as obvious in view of such prior art. Crown's arguments lack merit because it has not shown that the prior art contains a teaching, suggestion or motivation to reduce the reflectance contribution of the solar control film to "no more than about two percent," and the district court properly concluded that there was no such teaching, suggestion or motivation in the prior art cited by Crown. *See Ruiz*, 234 F.3d at 665, 57 USPQ2d at 1167; *In re Rouffet*, 149 F.3d 1350, 1359, 47 USPQ2d 1453, 1459 (Fed.Cir.1998).

### B. The '258 Patent

On appeal, Crown argues that the district court erred in analyzing the impact of the ambiguities in the wave index calculation on the enablement requirement for the '258 patent. In addition to its enablement attack, Crown also argues that the '258 patent does not meet the written description requirement of § 112, first paragraph.

▄▄ The two requirements, while related and springing from the same factual predicates,[5] each carry a separate purpose. The purpose of the enablement requirement is to "ensure[ ] that the public

---

4. As indicated by this Court's questions at oral argument concerning the seemingly direct route to prove that the Gillery patent contains the two percent limitation implementing an embodiment of the Gillery patent and testing it this Court finds puzzling Crown's reluctance regarding this approach to generate extrinsic proof that the Gillery patent inherently meets the two percent limitation.

5. Also springing from these same underlying factual predicates is the § 112, second paragraph, definiteness requirement. This requirement is distinct from the enablement and description requirements, which arise from § 112, first paragraph.

[D]efiniteness and enablement are analytically distinct requirements, even though both concepts are contained in 35 U.S.C. § 112. The definiteness requirement of 35 U.S.C. § 112, ¶ 2 is a legal requirement, based on the court's role as construer of patent claims ... Definiteness requires the language of the claim to set forth clearly the domain over which the applicant seeks exclusive rights.... The test for whether a claim meets the definiteness requirement is "whether one skilled in the art would understand the bounds of the claim when read in light of the specification."

*Process Control Corp.*, 190 F.3d at 1358 n. 2, 52 USPQ2d at 1034 n. 2 (internal citations omitted). *See also* 3 Donald S. Chisum, Chisum on Patents, § 8.03 at 8–14 (2001) (noting

knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys.*, 166 F.3d 1190, 1196, 49 USPQ2d 1671, 1675 (Fed.Cir.1999). One of our predecessor courts has held the enablement and written description requirements to be separate and distinct, and has held that a "specification may contain a disclosure that is sufficient to enable one skilled in the art to make and use the invention and yet fail to comply with the description of the invention requirement." *In re Barker and Pehl*, 559 F.2d 588, 591, 194 USPQ 470, 472 (CCPA 1977). Subsequently, this court has held that the purpose of the written description is distinct from merely explaining how to make and use the invention. *See Enzo Biochem*, 285 F.3d at 1020–22; *Vas–Cath*, 935 F.2d at 1563–64, 19 USPQ2d at 1117. In light of the odd procedural setting of the written description issue in this appeal, our disposition of this appeal based on enablement, and given that the two requirements are distinct and each are necessary, we do not reach the written description issue except to note that it appears to remain available for adjudication or disposition by the district court on remand.[6]

■ Turning to the enablement issue, we agree with Crown that the ambiguities and lack of specified boundary conditions, and Crown's proffered evidence concerning the same, raise a genuine issue of material fact as to whether a person of ordinary skill in the pertinent art could make or use the invention of the '258 patent[7] without undue experimentation. *White Consol. Indus. v. Vega Servo–Control*, 713 F.2d 788, 791, 218 USPQ 961, 963–64 (Fed.Cir.1983). The district court found otherwise. However, it appears not to have considered the statements of Crown's expert concerning the effect of unspecified boundary conditions on the calculation of wave index.

Following the reasoning of the district court, Solutia argues that a person of ordinary skill in the pertinent art could overcome any ambiguities in the wave index calculation without undue experimentation by testing a limited number of possibilities for computing the wave index. In response, Crown offers statements of its expert that the '258 patent does not define amplitude and that a person of ordinary skill in the art would not know whether to measure amplitude: (i) from a centerline running horizontally through the "middle" of the trace; (ii) from "peak-to-peak," *i.e.*, from the bottom of a valley to the top of a peak; or (iii) from some other baseline or reference running horizontally somewhere through the trace. On its face, the '258 patent does not define amplitude. However, average amplitude directly impacts the wave index calculation because wave index

---

the difference between the requirements of "definiteness, which claims must meet, from the requirements of enablement, which the disclosures of the specification must meet").

6. Based on the record before us, the written description issue has the following procedural posture: (i) Crown's Count VI of its amended complaint raised the written description issue; (ii) Solutia's summary judgment motion argued that the '258 patent met the written description requirement; (iii) in opposition Crown argued that the written description requirement was not met; (iv) the district court did not dispose of the written description issue or discuss the issue in its opinion in a way that enables our review; and (v) Crown preserved the written description issue in its appeal to this court and thus has not waived its further adjudication on remand.

7. All seventeen claims of the '258 patent refer to wave index, thus they all stand or fall together.

is the result of multiplying average amplitude by average pitch. Simply put, the wave index calculation would produce two separate numbers if calculated with a centerline versus a "peak-to-peak" amplitude. Worse yet, a range of various wave index values are possible for amplitude baselines running horizontally somewhere through the trace at various locations. To show that the wave index calculation is enabled, Solutia cites various details from the '258 patent concerning how to perform the test to generate a trace of the PVB surface to calculate wave index. However, Solutia does not present sufficient evidence to rebut Crown's demonstration of the amplitude ambiguity in the wave index calculation. This is so because: (i) the amplitude is a direct input to the critical claim limitation, a wave index of less than 15,000 square micrometers; and (ii) the novel aspects of the invention must be disclosed and not left to inference, that is, a patentee may not rely on the inference of a person of ordinary skill in the pertinent art to supply such novel aspects. *See Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366, 42 USPQ2d 1001, 1005 (Fed.Cir. 1997) (stating that the knowledge of a hypothetical person of ordinary skill in the art cannot be used to supply the patentable aspects of the invention).

Compounding the amplitude ambiguity, Crown also notes that the wave index is the result of two independently varying, unbounded terms: average pitch and average amplitude. On its face, this does not seem to be a problem. However, Crown's expert noted that because boundary conditions are not specified, the claim covers inoperative embodiments. For example, a wave index of 15,000 square micrometers results from an average height of 1000 micrometers multiplied by an average pitch of 15 micrometers. Yet, according to Crown's expert, an average height of 1000 micrometers would not be acceptable for the PVB. As with the amplitude ambiguity, the problem goes well beyond this single example because a full range of resulting inoperative embodiments are possible for values of average height and average pitch that, when multiplied, produce a wave index value that meets the limitation of the claim. Such inoperative embodiments do not necessarily invalidate the claim. *See Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576–77, 224 USPQ 409, 414 (Fed.Cir.1984); *In re Cook,* 58 C.C.P.A. 1049, 439 F.2d 730, 735, 169 USPQ 298, 302 (1971) (noting that although claims may read on some inoperative embodiments, this does not necessarily invalidate the claim if the necessary information to limit the claims to operative embodiments is known to a person of ordinary skill in the art).[8] However, the inoperative embodiments support Crown's assertion that there is a genuine issue of material fact with respect to enablement. *See Atlas Powder,* 750 F.2d at 1576–77; *see also Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1358–59, 52 USPQ2d 1029, 1034–35 (Fed.Cir.1999) (holding that the district court failed in its

---

8. The court in *In re Cook* further notes that a claim may be invalid if it reads on significant numbers of inoperative embodiments. *In re Cook*, 439 F.2d at 734, 169 USPQ at 301–02 (citing *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 336 U.S. 271, 276–77, 69 S.Ct. 535, 93 L.Ed. 672, 80 USPQ 451, 453 (1949)). *See also In re Moore*, 439 F.2d 1232, 1236, 169 USPQ 236, 239 (CCPA 1971) (noting that the question is whether the scope of enablement conveyed by the disclosure to a person of ordinary skill in the art is commensurate with the scope of protection taught by the claims); Chisum, § 7.03[7][a] at 7–108 & n. 6.

claim construction to consider the effect of inoperative embodiments on invalidity due to lack of enablement).[9]

Further compounding the ambiguities with the wave index rules, the '258 patent's rules for determining which inflection points are "true" inflection points additionally support Crown's argument that it has raised a genuine issue of material fact. Crown demonstrated in various ways through its experts and arguments the potential indeterminacy in the rules. Solutia's expert admitted that there was some ambiguity in the rules with respect to whether a preceding peak or valley was the reference point in selecting a "true" peak or valley.

Solutia argues that even if the disclosed wave index calculation has ambiguities and is indeterminate, a person of ordinary skill in the pertinent art would be able to make and use the invention with some experimentation, but less than "undue" experimentation. Solutia argues that such a skilled person would only have to try two possibilities for amplitude, centerline and "peak-to-peak," and that experimenting to discover which of two possibilities to use is well within the boundary of undue experimentation. Crown counters that the amplitude ambiguity and potential inoperative embodiments, combined with the ambiguities in the smoothing rules, seems to suggest a wide range of possibilities which one must try.[10] With this wide range of possibilities, we agree that Crown has raised a genuine issue of material fact as to the amount and type of experimentation required, facts that will determine whether such experimentation is undue. *See Enzo Biochem Inc., v. Calgene Inc.*, 188 F.3d 1362, 1371, 52 USPQ2d 1129, 1135–36 (Fed.Cir.1999) (holding that a reasonable amount of experimentation does not invalidate a patent, but undue experimentation does invalidate, and holding that the *Wands* factors, which determine whether a patent's disclosure is insufficient such that the experimentation required would be undue, apply to inter partes litigation).[11] While ultimately a trier of fact may reach the conclusion that any required experimentation is not undue, Crown has shown that sufficient potential for undue experimentation exists such that disposal on summary judgment is improper.

9. The inoperative embodiment inquiry informs the enablement inquiry; they are not the same inquiry. *Nat'l Recovery Techs.*, 166 F.3d at 1196, 49 USPQ2d at 1676.

10. We note that the specification for the '258 patent states that in the disclosed embodiment the wave index is calculated using a software program running on a personal computer being fed the trace line. '258 patent, col. 7, ll. 64–68. Undoubtedly, Solutia took care to ensure that the program contained the necessary boundary conditions and other information to calculate wave index to practice the invention. It appears, however, that Solutia took substantially less care in transcribing the information from the program into the specification's rules for calculating wave index. This incongruity will be relevant to the question of enablement upon remand. *See* Chisum, § 7.03[4][e] at 7–86 & n. 77 ("A specification that claims an invention requiring implementation through computer software but fails to set forth the details of computer programming may present issues of whether the experimentation required to write the programming is reasonable or unreasonable.") (summarizing the teachings of various cases).

11. The *Wands* factors are:

(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*In re Wands*, 858 F.2d 731, 737, 8 USPQ2d 1400, 1404 (Fed.Cir.1988).

## CONCLUSION

Because we hold that the '511 patent has not been shown to be invalid due to anticipation or obviousness and that a genuine issue of material fact exists with respect to facts underlying the determination of enablement for the '258 patent, we affirm-in-part and reverse-in-part the district court's decision and remand for additional proceedings consistent with this opinion.

*AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.*

## COSTS

Each party bears its own costs.